IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **J. C. PENNEY COMPANY, INC.** *et al.*,[1] | § | **Case No. 20-20182** |
| | § | |
| | § | |
| **Debtors.** | § | **Chapter 11** |

**AD HOC EQUITY COMMITTEE'S EMERGENCY MOTION TO VACATE
FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL,
(II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION
SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY,
AND (IV) GRANTING RELATED RELIEF**
[Relates to ECF # 566]

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT
YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY
CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU
AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A
RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST
FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE
THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY
THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A
TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT
FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND
HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE
HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT
MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE
THE MOTION AT THE HEARING.**

**EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT
CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU
WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO
THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE
EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD
FILE AN IMMEDIATE RESPONSE.**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at **http://cases.primeclerk.com/JCPenney**.  The location of the Debtor J.C. Penney Company, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 6501 Legacy Drive, Plano, Texas 75024.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

The Ad Hoc Committee of Equity Interest Holders (the "AHEC") of J.C. Penney Company, Inc., *et al.* (the "Debtors" or "JCPenney"), hereby files this motion to vacate (the "Motion") the *Final Order (I) Authorizing the Debtors To (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [ECF # 566] (the "DIP Loan Order"), and in support hereof, respectfully states as follows:

## I.    INTRODUCTION

1.      On Saturday, May 16, 2020, this Court held an extraordinary, emergency first day hearing (the "First Day Hearing") in these cases at which the Debtors provided a dire outlook:  as a result of unprecedented economic disruption caused by the COVID-19 pandemic, the Debtors were facing a severe cash shortage and, within just a few months, would need an extraordinarily expensive infusion of capital to sustain operations.  With these dire projections casting a pall over these Bankruptcy Cases, the Debtors sought approval of the DIP Loan.  Noting that the DIP Loan package bordered on the edge of being offensively "expensive" and included much that was "highly objectionable," the Court accepted the Debtors' projections and approved the DIP Loan.

2.      Ultimately, the Debtors' doom and gloom warnings have proven false.  Rather than experiencing an immediate cash or liquidity crisis, the Debtors have significantly outperformed their grossly pessimistic projections – exceeding initial Net Sales projections by more than 25%; initial Net Cash Flow projections by more than 551% and accumulating approximately $817 million more in available cash than initially projected (as compared to the Debtors' budget filed

on May 15, 2020 [ECF # 108]).[2]  Indeed, the simple truth is that the DIP Loan was never needed and has caused and continues to cause significant harm to the Debtors and their estates.

3.      Unfortunately, despite this significantly better than expected performance, the Debtors are languishing in these Bankruptcy Cases; stuck pursuing a remarkably bad sale transaction for the sole benefit of the DIP Lender Group.  As set forth herein, the DIP Loan was never needed and in light of that, the DIP Lender Group's benefit received from is unjust.  This Court should vacate the DIP Loan Order – or, alternatively, at a minimum, modify the DIP Loan Order to limit approval to new money advances only and deny approval of all deemed borrowings or roll up loans approved therein.

## II.      JURISDICTION AND VENUE

4.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(O).  Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

5.      The statutory predicate for the relief requested in this Motion are § 105 of the Bankruptcy Code,[3] or, alternatively, Rule 9024 of the Federal Rules of Bankruptcy Procedure.

## III.      BACKGROUND

### A.      *The Bankruptcy Filing and Formation of the Ad Hoc Equity Committee*

6.      On May 15, 2020 (the "Petition Date"), the Debtors filed voluntary petitions for relief (the "Bankruptcy Cases") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division (the "Court").  On

---

[2] **Exhibit A** hereto includes a comprehensive budget to actual comparison illustrative Debtors' performance relative to the budgets submitted in support of the DIP Loan.

[3] 11 U.S.C. §§ 101 – 1532, *et. seq.*

that same date, this Court entered an Order Directing Joint Administration of Chapter 11 Cases [ECF # 4].

7.      Pursuant to Bankruptcy Code §§ 1107(a) and 1108, the Debtors are operating their businesses and managing their property as debtors in possession. An official committee of unsecured creditors (the "UCC") was appointed on May 28, 2020.

8.      On May 28, 2020, Rahul Shekatkar, on behalf of shareholders, filed a motion to dismiss these Bankruptcy Cases, or in the alternative, appoint an equity committee. A hearing on the motion was held on June 6, 2020, and an agreement was reached on the record to appoint an ad hoc equity committee. Pursuant to that agreement, on June 10, 2020, this Court entered the *Order Regarding Shareholders' Motion to Dismiss Cases, or in the Alternative, to Appoint an Equity Committee* [ECF # 680] which ordered the formation of the AHEC.

**B.      *The Bankruptcy Proceedings and Approval of the DIP Financing***

9.      The Debtors entered the Bankruptcy Cases having agreed to a Restructuring Support Agreement ("RSA") that reflects extreme pessimism on the Debtors' part and articulates aggressive lender goals that have shaped these Bankruptcy Cases.  The RSA included a reorganized JCPenney corporate structure "architected by H/2 (one of the Debtors' pre-petition first lien lenders (the "First Lien Lenders"))" and post-petition financing (the "DIP Loan") from a subset of the  First Lien Lenders (the "DIP Lender Group") "who would ultimately own" the Debtors.  *Id*. at 29:22-23.  That DIP Loan, which was approved by this Court based upon projections that have proven to be grossly inaccurate, has dictated the course of these Bankruptcy Cases.  The DIP Loan has severely handcuffed the Debtors' ability to exit bankruptcy and, as set forth herein, will continue to severely restrict the ability of all other parties in interest in these Bankruptcy Cases from obtaining any real value.

10.     In multiple hearings beginning on the First Day Hearing and continuing through the June 4, 2020 final hearing to consider the Debtors' DIP Loan motion (the "Final DIP Loan Hearing"), the Debtors stressed two points in support of the urgent need for immediate approval of the DIP Loan.  First, the Debtors projected that, without access to the DIP Loan, the Debtors would "run out of money in late August."  *Transcript of Hearing* at 56:4-7, *In re J.C. Penney Co., Inc.* No. 20-20182 (Bankr. S.D. Tex. June 4, 2020, Mesterharm direct examination) (hereinafter, "Final DIP Loan Hearing Tr.").  Second, noting a need for speed in these Bankruptcy Cases – a concern echoed by this Court – the Debtors have routinely argued that the DIP Loan was necessary to ensure the continued cooperation and support of the First Lien Lenders as a class.  *See, e.g., Transcript of Hearing* at 8:23-9:03, *In re J.C. Penney Co., Inc.* No. 20-20182 (Bankr. S.D. Tex. June 2, 2020) (Sussberg speaking), *Final DIP Loan Hearing Tr.* at 22:06-13 (Sussberg speaking).

11.     The Court accepted the Debtors' pessimistic projections and found that approval of the DIP Loan, which the Court described as being "highly objectionable" and "expensive," provided the only potential path toward a successful exit from bankruptcy.  Time, however, has shown that the DIP Loan was not only unnecessary, but has stood as the most significant obstacle preventing the Debtors from concluding these Bankruptcy Cases.  In particular, the DIP Loan has prevented the Debtors from pursuing a restructuring transaction, rather than a forced sale.  Thus, the Debtors have not truly received any of the benefits expected from an admittedly objectionable DIP Loan, and the Debtors and their estates have suffered severely.

## IV.     RELIEF REQUESTED

12.     The DIP Loan Order approved a DIP Loan that has not been and will not be used by the Debtors.  Further, rather than facilitating an expeditious case, the DIP Loan Order has enabled the DIP Lender Group to dominate the Debtors and direct these Bankruptcy Cases to their

exclusive benefit.  By this Motion, the AHEC seeks entry of an order vacating or modifying the DIP Loan Order in order to prevent such injustice.

V.   <strong><u>ARGUMENT AND AUTHORITY</u></strong>

13.     Pursuant to Bankruptcy Code § 105, or, alternatively, Rule 60(b) of the Federal Rules of Civil Procedure, made applicable pursuant to Rule 9024 of the Federal Rules of Bankruptcy Procedure, the DIP Loan Order should be vacated or, alternatively, modified to limit approval solely to new money advances.

*A.*     ***<u>The Applicable Standard</u>***

14.     Initially, the AHEC notes that whether the DIP Loan Order is indeed a final order is not clear in light of recent Supreme Court precedent.  *See Bullard v. Blue Hills Bank*, 135 S.Ct. 1686, 1692 (2015) (holding that order denying plan confirmation was not final because the order did not "[fix] the rights and obligations of the parties").  Thus, while the DIP Loan Order is titled "final," the order does not actually fix the rights of the DIP Lender Group; confirmation of a plan or other further final order fixing such rights is required.  Under *Bullard*, then, the DIP Loan Order does not appear to be a final order.  Indeed, even before *Bullard*, the finality of post-petition financing orders had been questioned.  *See Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1354 (7th Cir. 1990, J. Easterbrook) (noting that DIP finance order was not a final judgment and that whether such may be vacated "is a question of the law of the case, not of Rule 60(b).").  Nevertheless, the AHEC asserts that Rule 60(b), while not strictly applicable, provides a useful framework for analyzing the needed relief requested herein.

15.     Pursuant to Rule 60(b), a court may vacate or modify an order (as applicable here) upon a showing of: (i) mistake, inadvertence, surprise, or excusable neglect; (ii) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a

6

new trial under Rule 59(b); or (iii) any other reason that justifies relief.  Fed. R. Civ. P. 60(b)(1), (2), (6).  The Fifth Circuit has stated that Rule 60(b) "is to be construed liberally to do substantial justice."  *Laguna Royalty Co. v. Marsh*, 350 F.2d 817, 823 (5th Cir. 1965).  The Laguna Court further noted that "[Rule 60(b)] is broadly phrased and many of the itemized grounds are overlapping, freeing Courts to do justice in hard cases where the circumstances generally measure up to one or more of the itemized grounds."  *Id*.

16.     The matter before the Court is certainly a hard case.  The Debtors, multiple parties in interest, including the UCC, and this Court all accepted to one degree or another that without the DIP Loan the Debtors would run out of cash as early as mid-July 2020.  This assumption and acceptance of the Debtors' financial projections has been clearly established as incorrect.  Whether then viewed as resulting from "mistake" or "newly discovered evidence," relief from the DIP Loan Order is appropriate.  Additionally, because the Debtors have not once utilized the DIP Loan, relief is further warranted to prevent the DIP Lender Group from unjustly diverting substantial value away from the Debtors, the Debtors' estates, and the Debtors' creditors and equity interest holders.

**B.     *Entry of the DIP Loan Order Resulted From Mutual Mistake.***

17.     Relief from the DIP Loan Order is justified because the order resulted from "mistake."  FED. R. CIV. P. RULE 60(b)(1).  The Court looks to subsection (b)(1) of Rule 60 which allows relief for reasons of mistake, inadvertence, surprise, or excusable neglect. Whether relief is appropriate under Rule 60(b)(1) is left to the Court's sound discretion.  *In re Spears*, 352 B.R. 79, 82 (Bankr. N.D. Tex. 2006).  The court may consider equitable principles and must attempt to balance the desire to achieve finality against the policy of resolving a dispute fully on the merits.  *Id*.

18.     In the *Spears* matter, the bankruptcy court granted a motion for relief from an agreed order allowing and setting an unsecured deficiency claim.  *Id.* at 81.  At the time of entry, the parties believed that all of the collateral securing the lender's claim had been liquidated and no further security remained.  *Id.* at 82.  This mistaken assumption was determined to be inadvertent or a mutual mistake.  *Id.* at 83.  Accordingly, the court held that relief pursuant to Rule 60(b)(1) was warranted.  *Id.*

19.     Here, as noted above, the central assumption justifying approval of the DIP Loan was the belief that the Debtors would soon be out of money.  That assumption was not reached as a result of fraud or misrepresentation but resulted from the mistaken belief that JCPenney's cashflow during the COVID-19 pandemic would be insufficient to support operations.  As this assumption has ultimately proven to be materially incorrect, modification of the DIP Loan Order is appropriate.

     *i.*     <u>*The Debtors' Faulty Cash Projections Resulted in a Mistake.*</u>

20.     On the Petition Date, the Debtors held approximately $475 million in cash available to "be used to fund operations, pay for employees, and administer these [Bankruptcy Cases]."  First Day Tr. at 28:09-12 (Sussberg speaking).  Citing the devastating effects of the COVID-19 pandemic, however, the Debtors projected that this cash would run out by mid-July absent approval of the DIP Loan.  See Interim Order (I) Authorizing Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b) [ECF # 108], Annex 1:  Budget, p. 58 (the "Interim Budget").

21.     The Debtors exceeded expectations and projections out of the gate – performing "better than expected, opening more stores quicker, and having some strong [sales]."  Final DIP

Loan Hearing Tr. at 54:01-04 (Mesterharm testimony).  By the date of the Final DIP Loan Hearing, the Debtors had accumulated approximately $537 million in available cash prior to receiving the first DIP Loan draw – exceeding initial projections by more than $140 million.  Id. at 54:11-14.

22.     Nevertheless, the Debtors remained conservative in their outlook – positing that a portion of the $140 million in extra cash was nothing more than a temporary anomaly related to the timing of certain payments and expressing continued concerns regarding the COVID-19 effect and civil unrest.  Id. at 54:03-04, 59:05-10.  As a result, the Debtors continued to project a liquidity shortfall – now occurring in late August – unless the Debtors received the DIP Loan.

ii.     *The Debtors' Dire Cash Shortage Has Never Materialized.*

23.     Time, however, would prove such pessimism to be ill-founded, as the Debtors have consistently exceeded projections.  The Debtors' overly conservative projections have not just proven to be slightly wrong; they have been significantly wrong – to the positive – on a consistent basis.

24.     As illustrated in the chart below, by July 18, 2020, the Debtors' total available cash exceeded projections by approximately $400 million (and exceeded the projections in the Interim Cash Budget by over half a billion dollars).





25.     Significantly, this better than expected cashflow has been consistent and continual through these Bankruptcy Cases.   In mid-August, just shortly before the Debtors' advisors predicted a liquidity crisis, the Debtors' had instead amassed over $1.25 billion of cash.  As of October 3, 2020, the Debtors' Net Cash Flow exceeded the DIP Budget projection by 551% and the Debtors had accumulated $817 million more in short-term investment funds than projected.



26.     With the passage of time, it has become painfully obvious that the Debtors' financial needs do not even remotely justify the DIP Loan and the overreaching protections afforded therein.  In fact, as of October 3, 2020, the Debtors held sufficient cash to repay all new money advances under the DIP Loan and still have approximately $367 million more in cash than projected in the DIP Budget.  Simply put, the DIP Loan was never, and will never be, needed in these Bankruptcy Cases.  Entry of the DIP Loan Order resulted from the mistaken belief otherwise, and Rule 60(b)(1) allows this Court to undo that mistake by vacating or modifying the DIP Loan Order.

**C.**     ***Entry of the DIP Loan Order Resulted from "Faulty" Evidence.***

27.     Alternatively, "newly discovered" evidence supports relief from the DIP Loan Order.  FED. R. CIV. P. Rule 60(b)(2).  If a federal court's decision is based upon faulty evidence, the court's judgement may be subject to a motion for relief pursuant to Rule 60(b)(2), which allows for the setting aside of a judgment on the basis of newly discovered evidence.  *N.Y. Life Ins. Co.*

*v. Gillispie*, 203 F.3d 384, 388 (5th Cir. 2000). Here, relying upon the faulty projections discussed above, the Debtors' expert witness, Mesterharm, testified that the Debtors needed the DIP Loan in order to have the cash on hand required to continue operations through these Bankruptcy Cases. The Court relied upon Mr. Mesterharm's opinion and supporting budget in granting the DIP Loan Order.

28. Yet, as set forth herein, time has shown that the Debtors' projections that formed the foundation of Mr. Mesterharm's opinion were faulty.[4] Not only have the Debtors outperformed the DIP Budget in almost every category (i.e. exceeding Net Cash Flow projections by more than 551%), it is now clear that the Debtors never actually needed the DIP Loan proceeds. In fact, the Debtors are currently holding sufficient cash to repay all new money advances under the DIP Loan and still have $367 million more in cash than budgeted. In other words, the Debtors could repay the new money advances today and would still have at least $367 million more in cash to conclude these Bankruptcy Cases than Mr. Mesterharm projected would be needed. Accordingly, this Court may vacate or modify the DIP Loan Order under Rule 60(b)(2).

**D.** ***Vacatur or Modification of the DIP Loan Order is Necessary to Achieve a Just Result.***

29. "In simple English, the language of the 'other reason' clause, for all reasons except the five particularly specified, vest power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice." *Klapprott v. U.S.*, 335 U.S. 601, 614-15 (1949). Here, the unnecessary DIP Loan is being leveraged by the DIP Lender Group to compel

---

[4] As the Debtors have noted, however, the COVID-19 pandemic has produced unprecedented challenges in this country. Facing this uncertainty, the Debtors assumed a worst case scenario that never materialized. Those faulty assumptions were relied upon by Mr. Mesterharm in formulating his opinion. Importantly, the AHEC does not challenge Mr. Mesterharm's qualifications, his methodologies and does not argue that reliance upon Mr. Mesterharm's opinion was *per se* faulty. The question before this Court, then, is not whether Mr. Mesterharm is a faulty expert, but how to address the unjust results that stem from this Court's order entered in reliance upon what has been proven to be wildly inaccurate assumptions.

a result that unjustly provides the DIP Lender Group a greater return than is permissible under the Bankruptcy Code in a manner that deprives stakeholders the typical protections afforded in a chapter 11 case.  Because relief from this unjust result can be accomplished without significant harm to the DIP Lender Group, Rule 60(b)(6) is appropriate.

i.     *The DIP Loan protections are being used to compel an unjust result.*

30.     With the accepted assumption that the Debtors lacked sufficient cash to survive, this Court also accepted that survival depended upon the cooperation of the DIP Lender Group – cooperation that was expected to be given in good faith following entry of the DIP Loan.[5]  Yet, it is abundantly clear now that the DIP Lender Group's support is actually contingent upon the Debtors' pursuit of a reorganization structure that unfairly privileges the DIP Lender Group at the very severe cost to all other constituents.

31.     Even as the Debtors repeatedly outperformed projections, the DIP Lender Group used its significant leverage to stall and force further concessions from the Debtors.  For example, despite the fact that the Debtors were performing substantially better than expected, the DIP Lender Group's refusal to commit support for a plan of reorganization compelled the Debtors to unnecessarily make a second draw under the DIP Loan.

32.     Despite having assured this Court that the second draw would not be necessary if the Debtors' liquidity position significantly improved, on July 1, 2020, counsel for the Debtors announced that the second draw would likely be made.  The Debtors advised this Court that making the unnecessary drawdown would ensure that negotiations related to the Debtors' proposed

---

[5] The AHEC lacks sufficient information to allege that any party has acted in bad faith, yet, the substantial delays and misdirection forced upon the Debtors certainly raises questions.  In the context of DIP lender cooperation, "[g]ood faith requires fair effort."  *In re Duro Indus.*, 2004 Bankr. LEXIS 1235 at *17 (Bankr. D. Mass. Aug. 26, 2004).

Business Plan proceeded smoothly.  Transcript of Hearing at 17:03-18-07, *In re J.C. Penney Co., Inc.* No. 20-20182 (Bankr. S.D. Tex. July 1, 2020).  The Debtors then made the second draw despite a demonstrated lack of financial need.  The desired cooperation, however, does not seem to have materialized.  For example, the Debtors delivered the Business Plan on July 8, 2020 in compliance with the terms of the RSA and DIP Loan.  This eagerness to appease the DIP Lender Group, however, has gone unrewarded, as the Business Plan has never been approved.  Instead, after multiple extensions and expansions of the DIP Lender Group's control over these Bankruptcy Cases, the Debtors pivoted to the singular pursuit of a sale of substantially all of the Debtors' assets to the exclusion of any other alternative – an outcome that produces value solely for the First Lien Lenders and no other constituency.

33.     Perhaps most troubling regarding the second draw, however, is that fact that the Debtors still may not have actual access to these funds.  Pursuant to the terms of the DIP Loan, the second tranche of funds was disbursed into and remains held in escrow pending the DIP Lender Group's approval of the Business Plan.

34.     Ultimately, then, rather than ensure the cooperation and support of the DIP Loan Group, the DIP Loan has resulted in substantial delay and a lack of transparency.  More recently, the DIP Loan is being used to force the Debtors to sell everything to the DIP Lender Group in exchange for a pittance or face complete enterprise failure.  As a direct result of their status as DIP lenders, the DIP Lender Group is poised to receive (as defined in ECF # 1502) 90% of the value realized from the OpCo sale, PropCo, Liquidation Co., the OpCo Earnout, remaining cash on hand and all future upside from the proposed sale *in perpetuity* in exchange for a paltry $1.0 billion credit bid.  Because the value of these assets significantly exceeds the value of the DIP Loan claims, this result is antithetical to the priority structure set forth in the Bankruptcy Code.

35.     With the DIP Loan Order in place and unmodified, however, the Debtors' ability to pursue other value maximizing options is extremely limited.  For example, freed from the onerous and unnecessary DIP Loan, the Debtors could realistically consider plan structures not currently feasible given the $900 million administrative priority claim awarded to the DIP Lender Group.

36.     Relief from the DIP Loan Order will enable all other creditors and stakeholders to at a minimum seek, and likely obtain, a recovery from the Debtors.  Given that the Debtors will not ever have an actual financial need to use the DIP Loan proceeds, allowing the DIP Loan to remain as an effective bar to greater estate value is patently unjust.

   ii.  *The DIP Lender Group will not be substantially harmed.*

37.     Relief from the DIP Loan Order will not substantially harm the DIP Lender Group. The DIP Lender Group has already obtained an enhanced collateral package, and well above-market interest rates and fees (including $45 million in commitment and upfront fees on the new money portion of the DIP Loan).  As these protections serve as security against repayment and the Debtors have more than sufficient cash to repay the new money advances under the DIP Loan, the DIP Lender Group will not be significantly impaired.  Further, given their first priority lien position, the loss of administrative priority will not be that significant – a point the DIP Lender Group seemingly admitted during recent hearings.

38.     It is understandable that the DIP Lender Group wishes to enjoy the significant windfall afforded to them by the DIP Loan.  The DIP Lender Group took a risk in loaning to the Debtors at the time of the greatest uncertainty of the Covid 19 pandemic.  That risk – valued in the interest rate, fees, internal valuations of the Debtors' collateral, and certain other protections afforded to the DIP Lender Group – was greatly overstated through the Debtors' own dire financial

projections.  Because the Debtors' projections were so far off the mark, the DIP Lender Group is receiving far more than the negotiated benefit of their bargain.  Rebalancing that transaction is required to ensure justice obtained through these Bankruptcy Cases.

## VI.  CONCLUSION

39.    The AHEC is fully aware that the relief herein is extraordinary.  Parties must be able to rely on Court Order.  Substantial time and effort have been expended pursuing the outcome predetermined by the RSA and DIP Loan.  Yet, sometimes a course correction must be made to account for actual occurrences in order to avoid a miscarriage of justice.  As the facts herein show, such a course correction is needed in these Bankruptcy Cases.  The DIP Loan is an albatross around the neck of the Debtors to the detriment to all other stakeholders and should be vacated or modified.

## VII.    REQUEST FOR EMERGENCY CONSIDERATION

40.    As the Debtors have noted on many occasions, time is of the essence in these Bankruptcy Cases.  Through this Motion, the AHEC seeks to provide greater optionality to the Debtors in an effort to hasten, not delay, the conclusion of these Bankruptcy Cases.  As such, in order to minimize any potential disruptions, and because the relief sought here will facilitate a more just result for all parties, the AHEC requests that this Motion be heard on an emergency basis.

## VIII.    PRAYER

WHEREFORE, the AHEC requests that this Court enter an vacating the DIP Loan Order or, alternatively, at a minimum, modifying the DIP Loan Order to limit approval to new money advances only and deny approval of all deemed borrowings or roll up loans approved therein., and for such other and further relief as the Court may deem just and proper.

Dated: October 12, 2020.

Respectfully submitted,

**OKIN ADAMS LLP**

By:  \_\_\_\_\_/s/ *Matthew S. Okin*_____
  Matthew S. Okin
  Texas Bar No. 00784695
  mokin@okinadams.com
  David L. Curry, Jr.
  Texas Bar No. 24065107
  dcurry@okinadams.com
  Johnie A. Maraist
  Texas Bar No. 24109505
  jmaraist@okinadams.com
  1113 Vine St., Suite 240
  Houston, Texas 77002
  Tel: 713.228.4100
  Fax: 888.865.2118

**ATTORNEYS FOR THE AD HOC
COMMITTEE OF EQUITY INTEREST
HOLDERS**

## CERTIFICATE OF SERVICE

  I hereby certify that a true and correct copy of the foregoing was served on October 12, 2020 via the Court's CM/ECF system to all parties consenting to service through the same.

By:  /s/ *David L. Curry, Jr.*_____
  David L. Curry, Jr.

**<u>EXHIBIT A</u>**

**J.C. Penney Company, Inc.**
DIP Cash Flow Variance Scenario Analysis - Actuals (WE 05/23/20 - WE 10/3/20)
*(US $ MMs)*

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | DIP Budget - Docket # 108 (05.15.20) | | | | DIP Budget - Docket # 513-6 (06.03.20) | | | | |
| DIP Budget Iteration / Date --> | | *Budget* | *Actual* | *Var $* | *Var %* | *Budget* | *Actual* | *Var $* | *Var %* | |
| Budget / Actual / Variance --> | | 23-May | 23-May | 23-May | 23-May | 23-May | 23-May | 23-May | 23-May | |
| Week Starting --> | | 03-Oct | 03-Oct | 03-Oct | 03-Oct | 03-Oct | 03-Oct | 03-Oct | 03-Oct | |
| Week Ending --> | | | | | | | | | | |
| **Net Sales** | | $  1,855 | $  2,481 | $  626 | 25.2% | $  2,279 | $  2,481 | $  203 | 8.2% | |
| **Collections & Disbursements** | | | | | | | | | | |
| **Cash Receipts** | | | | | | | | | | |
| 1  Sales Receipts | | 1,943 | 2,614 | 671 | 25.7% | 2,361 | 2,614 | 254 | 9.7% | |
| 2  Other Receipts | | 107 | 138 | 31 | 22.6% | 113 | 138 | 25 | 18.4% | |
| **Total Collections** | | 2,050 | 2,752 | 702 | 25.5% | 2,473 | 2,752 | 279 | 10.1% | |
| **Operating Disbursements** | | | | | | | | | | |
| 3  Domestic Merchandise Vendor | | (773) | (881) | (108) | (12.3)% | (767) | (881) | (114) | (13.0)% | |
| 4  Import Merchandise Vendor | | (298) | (289) | 8 | 2.9% | (511) | (289) | 222 | 76.7% | |
| 5  Sales Tax | | (94) | (161) | (67) | (41.6)% | (144) | (161) | (17) | (10.8)% | |
| 6  Freight, Duty, and Broker | | (149) | (142) | 7 | 4.8% | (184) | (142) | 42 | 29.7% | |
| 7  Payroll and Benefits | | (476) | (470) | 6 | 1.2% | (572) | (470) | 102 | 21.6% | |
| 8  Occupancy | | (266) | (217) | 49 | 22.6% | (265) | (217) | 48 | 21.9% | |
| 9  Non-Marketing Operating (NFR) | | (259) | (217) | 42 | 19.3% | (291) | (217) | 75 | 34.4% | |
| 10  Marketing | | (181) | (85) | 96 | 112.8% | (132) | (85) | 47 | 55.3% | |
| 11  Other | | (112) | (3) | 109 | 3571.5% | (68) | (3) | 65 | 2127.0% | |
| **Total Operating Disbursements** | | **(2,607)** | **(2,466)** | **141** | **5.7%** | **(2,934)** | **(2,466)** | **468** | **19.0%** | |
| **Non-Operating Disbursements** | | | | | | | | | | |
| 12  Debt Service and Fees | | (110) | (86) | 24 | 27.7% | (118) | (86) | 32 | 36.8% | |
| 13  Restructuring Professionals | | (48) | (36) | 12 | 33.4% | (49) | (36) | 13 | 37.8% | |
| 14  Other Non-Operating | | (27) | (19) | 9 | 44.9% | (29) | (19) | 10 | 53.9% | |
| **Total Non-Operating Disbursements** | | **(185)** | **(141)** | **44** | **31.5%** | **(196)** | **(141)** | **55** | **39.4%** | |
| **Net Cash Flow** | | **(742)** | **146** | **888** | **609.7%** | **(657)** | **146** | **803** | **551.3%** | |
| **Liquidity** | | | | | | | | | | |
| **Book Cash Position** | | | | | | | | | | |
| 15  Book Cash - Beginning | | 475 | 476 | 1 | 0.2% | 476 | 476 | - | | |
| 16  Plus: Net Cash Flow | | (742) | 146 | 888 | 609.7% | (657) | 146 | 803 | 551.3% | |
| 17  Plus: Revolver Draw/(Paydown) | | - | - | - | | 6 | - | (6) | | |
| 18  Plus: DIP Draw/(Paydown) | | 450 | 450 | - | | 450 | 450 | - | | |
| 19  Plus: Treasury Adjustment | | - | 23 | 23 | 100.0% | 3 | 23 | 20 | 87.0% | |
| **Book Cash - Ending *(excl. non-bank amts)*** | | **183** | **1,095** | **912** | **83.3%** | **278** | **1,095** | **817** | **74.6%** | |
| Book Cash - Scenario Adjustments | | | | | | | | | | |
| 20  Less: DIP Draw/(Paydown) | | (450) | (450) | - | | (450) | (450) | - | | |
| **Adjusted Book Cash - Ending *(Scenario Only)*** | | **(267)** | **645** | **912** | **141.4%** | **(172)** | **645** | **817** | **126.7%** | |

**FINAL ORDER DIP BUDGET**