IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | | |
|---|---|---|---|
| IN RE: | § | CASE NO. 20-20184-11 | |
| | § | HOUSTON, TEXAS | |
| JC PENNEY DIRECT MARKETING | § | MONDAY, | |
| SERVICES, LLC, ET AL, | § | SEPTEMBER 9, 2024 | |
| DEBTORS. | § | 2:45 P.M. TO 3:13 P.M. | |

**ORAL RULING (VIA ZOOM)**

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                    SEE ELECTRONIC APPEARANCES

ERO:                           ZILDE COMPEAN

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX  77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**HOUSTON, TEXAS; MONDAY, SEPTEMBER 9, 2024; 2:45 P.M.**

THE COURT:  Good afternoon.  This is Judge Lopez.  Today is September the 9th.

I'm going to call the JC Penney case here in connection with an oral ruling.  I'm going to mute the line.  I'm going to read for a bit.  I'm going to just give you the decision.  I'll enter a short order reflecting this.

I want to thank all the parties for all the briefing and the arguments that were made.  I'm going to -- and this is in connection, this is JC Penney, Case No. 20-20184.  I know I asked folks to show up at 2:30.  I appreciate the 15-minute delay.

Okay.  So, I'm just going to get right to it.

(Automated voice says, "Conference muted.")

THE COURT:  Before I begin, let me just ask -- Mr. Peck, I see you're there.  Can you just raise your hand if you can hear me?

Okay, I just want to make sure folks can hear me.  Okay.

Before the Court is Eric Moore's Motion to Enforce the Sale Order, Settlement Agreement, Asset Purchase Agreement, and Motion for Turnover and distribution of funds and/or property exceeding the one billion Credit Bid amount and equitable subordination of the DIP holders' first and second lien debt and unsecured notes.  It's Docket No. 1533.

I note several parties have filed joinder in support of Moore's motion.

Court has jurisdiction under 28 USC 1334(b). This is a core proceeding under 28 USC 157(b).  This Court has constitutional authority to enter Final Orders and judgment on Moore's motion, *Stern v. Marshall*, 564 US 462, 486 pincite 487 (2011).

The party's expressed implied consent also provides this Court constitutional authority to enter a final judgment under *Wellness International Network, Ltd v. Sharif*, 575 US 665, 678 (2015).

This Court also retained jurisdiction to interpret and enforce its own orders and the Chapter 11 Plan confirmed in these cases.  For that, I turn to *Travelers Indem. Co. v. Bailey*, 557 US 137, 151 (2009), where the Supreme Court said the Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders.

I would note that I was not the original judge assigned to this case, but I was in October of 2023.  So, therefore, those Confirmation Orders and related orders, the Sale Order are my orders now as the Bankruptcy Judge sitting with jurisdiction presiding over these cases.

I'm going to read some background.

On November 9th, 2020, the Court signed an order approving the sale of substantially all of the Debtors'

assets.  I'm going to refer to that as the "Sale Order."  On December 12th, 2020, the Debtors filed their Amended Joint Chapter 11 Plan of Reorganization.  This is at Docket No. 2162, and that's the Plan.

And the cases were originally jointly administered under Case No. 20-20182.  I'd note that Moore's motion is filed under where the cases are now presiding, 20-20184.

On December 16th, 2020, the Court entered an Amended Order approving the Disclosure Statement for and confirming the plan.  That's in case 20-0182.  That's Docket 2190.  The Plan's effective date occurred in January of 2021.

The Plan and the Sale Order reflected a highly complex global settlement struck in connection with mediation during the COVID-19 pandemic.  The consideration for the sale was detailed in a motion seeking the relief at the November 2020 sale hearing, the Asset Purchase Agreement, which I'll refer to as the "APA," the Sale Order, the Disclosure Statement for the Plan, and the Plan.  The motion seeking approval of the sale requested, among other things, approval of the sale of the Opco assets free and clear of liens, claims, encumbrances to Opco on the terms set forth in the APA and the Sale Order, and approval of the sale of Propco assets free and clear of liens, claims,

encumbrances and interest to Propco purchaser through the issuance of securities by Propco on the terms set forth in the APA and the Sale Order.

The sale transaction contemplated an entity controlled by Simon and Brookfield, purchasing the Debtors' operating assets and running the Debtors' retail business on a go-forward basis.  That entity was referred to throughout the case as "Opco."

Also, a newly formed entity called Propco, P-R-O-P-C-O, would hold over 100 owned and ground leases, stored properties, and multiple distribution centers, and under the Plan, Propco would issue securities to the DIP Lenders and holders of first lien claims.

Following the sale transaction contemplated in the APA and consummated under the Plan, the Debtors' remaining estates, which I'll refer to as the "Wind-down Debtors" and the assets contained in it, would be wound down, dissolved, or liquidated by a Plan Administrator under the Plan.

Section 2.1 of the APA, which is admitted into the evidence, says the aggregate consideration for the Opco assets was an Opco Credit Bid, which is a cash payment equal to over $600 million plus a $1.3 billion ABL payoff amount plus assumption of certain assumed liabilities.  The aggregate consideration for the Propco assets was a Credit

Bid plus assumption of certain assumed liabilities.

The sale hearing transcript is also admitted into evidence.  At the sale hearing, the Debtors' investment testified starting around Transcript Page 208, that the total Credit Bid was $1,900,000,000 from the DIP lenders and $100 million from the first liens.  The cash component included $300 million cash from Simon and Brookfield, and $300 million from an exit asset-based loan to be provided in connection with the Plan.

The deal struck would be that after the one billion Credit Bid and the cash and certain debt infusions in connection with the sale transaction under the Plan, about $1.3 billion would be used to pay off an outstanding ABL, and eventually there would be about $692 million in cash left in the estate.  From this $692 million, the wind-down estate would pay administrative expenses, additional expenses, and then allowed claims under the Plan.

Exhibit 8, which was admitted into evidence, shows the sources and uses of funds from the sale transaction and the Plan.  There was also a settlement struck between first lien lenders, who initially supported the $900 million and $100 million Credit Bid, referred to as the "Majority Lenders," and those who opposed it, referred to as the "Minority Lenders."

An entity named Cetus Capital, LLC was a Minority Lender.  The terms of the settlement are embodied in a Settlement Agreement attached to the Sale Order.  It acknowledges the $900 million DIP Credit Bid and the $100 million 1L Credit Bid, and that the Credit Bid provides for the consideration to be provided to the beneficiaries of the Credit Bid to be allocated on the ratable amount of the DIP debt and the 1L debt being contributed to the Credit Bid.

Basically, 90 percent of the consideration being allocated to the DIP loan lenders on account of the DIP debt, and 10 percent of the consideration being allocated to the holders of the 1L debt on account of the $100 million 1L Credit Bid.

The Settlement Agreement, which is attached to the Sale Order, also says that the Sale Order would be implemented through the APA, approved under the Sale Order, and partially implemented through the Plan, which is also contemplated in the APA.  Paragraph 3 says that the Settlement Agreement was going to become binding on the date on which counsel to all parties executed and delivered to the other parties a countersigned page of the Settlement Agreement, subject to the filing of a certain pleading and entry of the Sale Order, including approval of the Settlement Agreement.

So, that would be the effective date.

Subject to the occurrence of the effective date, Paragraph 4 says the Debtors would pay to the members of the minority group a supplemental distribution of 40 million cash in settlement and resolution of all disputes with respect to the sale transaction, the Credit Bid, the APA, the Chapter 11 cases, the Sale Order and the Plan.

Paragraph 7 says the Debtors and the Majority Group agree that the fees and expenses and the legal, of the legal and financial advisers to the minority group incurred on or prior to the settlement effective date for 6 million would be payable by the Debtors, and the Debtors would pay such fees and expenses within 7 days of entry of the Sale Order.

And upon the occurrence of the settlement effective date, the minority group and each member thereof on behalf of themselves -- so, Cetus is member of the minority group, the Minority Lender group -- on behalf of themselves, their affiliates, and their respective successors and assigns were deemed to irrevocably and unconditionally waive, release, and forever discharge any claims they had in connection with the sale transaction, the Plan, the APA, the Credit Bid, the Sale Order, the DIP loan, the 1L debt, and the Debtors, or the Chapter 11 cases against the Majority Group, who I called the Majority

Lenders earlier, other than the right of the Majority Group to receive the 46 million consideration set forth in the Settlement Agreement, including receiving their kind of amount ratable as holders, either as DIP lenders or the holders of the 1L debt.  That was in Paragraph 9.

The Court conducted -- the Bankruptcy Court conducted a contested evidentiary sale hearing, and ultimately approved the sale for the consideration stated at the hearing and at the motion.  The Court also approved the Settlement Agreement between the majority and the 1L group.

I want to highlight a few paragraphs in the Sale Order, which is also admitted into evidence.  Finding of fact in Paragraph 5 on Page 15 of the APA, it says the APA and the consideration offered -- excuse me -- finding of fact in Paragraph 5 on Page 15 says the APA and the consideration offered by the purchasers pursuant to the APA constitutes reasonably equivalent value and fair consideration.

Paragraph 38 says the consideration provided by the purchasers, which includes the Credit Bid amount for the acquired assets under the APA, was deemed for all purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.  The transfer to the purchasers of the Debtors' rights, title, and interest -- this is paragraph 29

-- pursuant to the APA was and was deemed to be a valid, legal, and effective transfer of the Debtors' rights, titles, and interests in the acquired assets, free and clear of all claims of any kind whatsoever, with any such claims attaching to the net available proceeds to the extent the extent of the same validity, extent, and priority as immediately prior to the sale, subject to the provisions of the APA and the Sale Order.

Paragraph 35 says that no holder of a claim against the Debtors shall interfere with the purchaser's title to or use and enjoyment of the Debtors' interest in the acquired assets based on or related to such claim, except as expressly provided in the APA or in the Sale Order, if any, because those claims are transferred and attached to the net available proceeds from the sale of the acquired assets.

Paragraph 49 says Propco Trust will, for tax reporting purposes, report Propco as owning the assets it acquires at their fair market value at the time of the Propco closing, and the face amount underlying the Credit Bid amount shall not be determinative of fair market value, and such fair market value shall be used by Propco Trust and the Debtors for determining the aggregate value used for the Propco allocation, as that term is used in Section 9.2 of the APA, provided that the Debtors were not required to

report on such basis, if the Debtors determined, based on the advice of tax advisors, that there was no reasonable position under applicable tax law to report it.  I'd note that Section 9.2 of the APA addressed allocation of the purchase price among the acquired Debtor assets between the purchasers and the Debtor solely for US Federal and applicable State and local tax purposes.

The Disclosure Statement and the Plan implemented distributions described in the Sale Order.  For example, Footnote 5 to the Disclosure Statement says under the APA, Bidco was delivering a one billion Credit Bid, and at the Opco closing, Bidco was deemed to assign a portion of the Credit Bid amount to the Opco purchaser, which was referred to as the Opco Credit Bid amount in the APA, with the remaining Credit Bid amount to be Credit Bid at the Propco closing.

Under the Plan, the treatment for the 1.3 ABL is in Class 3.  The treatment is in full, in cash, as described in connection at the sale hearing.  The 9010 Credit Bid allocation and recovery described in the Settlement Agreement and the APA are implemented in the Plan.

Section 2, II(e) of the Plan, which is about treatment of DIP claims, says that on the effective date of the Plan, each holder of an allowed DIP claim will receive, under the Sale Order and the Confirmation Order, its Credit

Bid Pro Rata share of the Credit Bid Distributions.

The terms "Credit Bid," "Pro Rata," and "Credit Bid Distributions" are defined terms, and they're also used in the description of Class 4 1L debt claims.

"Credit Bid Pro Rata share" means -- it's defined in the Plan to mean, in accordance with the APA and the Sale Order and subject to the Settlement Agreement with respect to the Dip claims, each holder's allowed DIP claim bears to all allowed DIP claims why the Dip credit bears to the aggregate Credit Bid claim.

"Aggregate Credit Bid" means collectively the DIP Credit Bid and the prepetition first lien credit, which is the one million Credit Bid.

"DIP Credit Bid" means a Credit Bid of $900 million of DIP claims.

"Prepetition first lien Credit Bid" is a Credit Bid of a hundred million of the first lien debt.

"Credit Bid Distributions" is defined under the Plan, and that means all the assets whose purchase was authorized by the Sale Order other than the Opco acquired assets, including new Propco securities and all of the Debtors' cash, except as when necessary to fund the administrative priority reserve, the wind-down reserve, and others reserve.

So, Section II(e) of the Plan provides that each

holder of an allowed DIP claim would receive, among other things, its share of the 90 percent, 900 million of the one billion of the new Propco securities.

Section III(b)(4)(C), III(b)(4)(C) of the Plan deals with the treatment of first lien claims.  It says that each holder of an allowed first lien claim was going to receive, subject to the terms of the minority first lien group settlement, pursuant to the sale transaction on account of its aggregate Credit Bid, its Credit Bid Pro Rata share of the Credit Bid Distributions.  So, each holder of an allowed first lien claim receives, among other things, its 10 percent of the new Propco securities.

In October of 2023, years after the Sale Order and the Confirmation Order became final, non-appealable order, it appears that Moore acquired some of the Cetus 1L debt through an entity named Barnett US Equity Fund. Evidence is found in admitted Exhibit No. 9.

Moore believes there's two sets of books when calculating the amount available to distribute to first lien holders and other creditors refers to a wind-down report in November of '23 showing that as of the effective date, about a hundred million was available to distribute to first lien holders and nothing for second lien creditors.

But according to Moore, the DIP lenders received at least 3.5 billion in cash, cash equivalent, and real

estate in, quote, "Credit Bid Distributions" against their 900 million debt.  Despite the surplus, he says that they allege that recovery on the first lien secured debt was somehow capped on the first lien Credit Bid of about a hundred million.  Moore believes his first lien attached at a, quote, "fair market value" of the assets, not proceeds of the purchase price that includes the one billion Credit Bid.

Moore believes prior court orders also specifically require that fair market value be used, not to Credit Bid amount.  Moore asserts that the Debtors and the DIP lenders concealed that the 3.5 billion in property and cash was distributed and not the one billion Credit Bid amount, and that this allegedly violates the fair and equitable requirement under Sections 1129(b)(2)(a)(ii), and Section 363K of the Bankruptcy Code.

Moore says that the total debt of the DIP lenders/first lien lenders was 2.5 billion, and a Credit Bid of less than the full amount of this debt does not impair, reduce, or disallow the remaining debt.  So, there's no legal grounds for a cap of a hundred million on the first lien parties, and therefore, the distributions violate the Supreme Court's decision in *Jevic Holdings Corp*.

For these reasons, Moore seeks, one, full disclosure, and fair and equitable distribution of what he believes are the sale, of the surplus sale settlement funds,

according to applicable laws, including the Absolute Priority Rule; two, enforcement of the Court's fair market value requirement; three, equitable subordination of the DIP lending parties' first and second lien bonds and unsecured notes; and four, turnover and distribution of cash or property beyond the one billion Credit Bid amount.

This Court, me, conducted a hearing on the motion on September 4th.  At the hearing, documents listed at Docket No. 1563, and this is in case 20184, were admitted into the Record.

Before the hearing, Moore filed a motion and a supplement asking the Court to take judicial notice of certain documents.  Some of these documents were actually admitted in evidence at the hearing on Moore's motion.  So, there's no need to consider them for judicial notice: the Sale Order, the November 9th, 2020 hearing transcript, and the Disclosure Statement.

Federal Rule of Evidence 201 says that courts may take judicial notice of adjudicative facts.  It's not mandatory.  The Rule further says a court may judicially notice a fact that's not subject to reasonable dispute, because it is, one, generally known within the Trial Court's territorial jurisdiction, or two, can be accurately or readily determined from sources whose accuracy cannot be reasonably questioned.

Judicial notice may be used to determine, quote, "what statements the documents contain not for the truth -- not for proving the truth of such documents' contents." *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018, Footnote 1, (5th Cir. 1996). Note that the party requesting judicial notice has the burden of showing that the fact is appropriate for judicial notice.

Based upon that, I'll take judicial notice of the November 1, 2023 transcript, a July 25, 2024 hearing transcript -- that was in Case 20184; that one was before me -- and there was also a blank IRS Form 8594.

The Court declines to take judicial notice of all other documents requested by Moore under Federal Rule of Evidence 201.

Okay. Now, we get to the meat.

Moore's motion presumes that the actual purchase price for the assets was the, quote/unquote, "fair market value," which he says is about three billion, but as I detailed above, that's not accurate. The purchase price for the assets was the Credit Bid and additional consideration described in the sale motion, the sale hearing, the Settlement Agreement, the Sale Order, the Disclosure Statement, and the Plan.

Paragraph 49 of the Sale Order describes that for tax purposes, the Propco Trust will, for tax reporting

purposes, report Propco as owning the assets it acquires at their fair market value at the time of the probable closing, and the face amount underlying the Credit Bid amount won't determine the fair market value.

But that's not to say that the Credit Bid was not fair value.  The Sale Order expressly found that the purchase price to be the highest and best offer.  See for example, the Sale Order at Paragraph H and Paragraph BB. And as I noted above, the Sale Order at Paragraph 38 also says the consideration for the assets was reasonably equivalent value and fair consideration.  Thus, the purchase price is the consideration detailed in the APA, and the Bankruptcy Court found that it was fair value and for a consideration.

This Court carefully analyzed the evidence, and the Court's reading of it today is the only one.  The Bankruptcy Court found in the Sale Order that the Credit Bid and the proposed purchase price was fair value and the highest and best offer.  It is in that paragraph that it says is what the consideration is for the asset sale.

Paragraph 49 is to do for tax purposes, and it even gave the Debtors an out to say that if the Debtors found that they couldn't do it, that they had an out. There's no evidence in the Record to support allegations about additional billions of consideration.

It's important to also note that the Sale Order approved a sale transaction, and that sale transaction occurred years ago.  There's nothing really for this Court to enforce related to the Sale Order today, right?  The Sale Order just approved a purchase price and the consideration, also approved releases thereunder, but Moore doesn't seek to enforce the releases stepping into Cetus's shoes.

Now, let me turn to the distributions for 1L debt claims.  Those, they were approved under the order confirming the Plan, not the Sale Order.  The Plan incorporates the 9010 distribution based upon the Credit Bid Allocation -- that's a defined term -- based on the cash the estate actually had after the paydown of the ABL and administrative expenses, right?

The Plan provides for the payment in full in cash of the ABL.  There's not billions there to distribute.  There never was.  The wind-down estate did not receive billions.  There's no evidence that wind-down professionals are not making distributions based on the actual terms of the Plan.  So, there's nothing for the Court to enforce under the Plan or the Confirmation Order.

There's no violation of the absolute priority rule or *Jevic* either.  I'd note that the absolute priority and *Jevic* issues were resolved in connection with Plan confirmation years before Moore became a debt holder, and a

Motion to Enforce the Plan cannot be used as a back-door effort to make Plan confirmation objections.  The confirmation has been a Final Order for years.

And more importantly -- and also, I should say, *Jevic* doesn't apply.  In *Jevic*, the Supreme Court said that the Bankruptcy Courts can't authorize distribution of settlement proceeds that do not follow priority distribution scheme without the consent of affected creditors.  That case involved a proposed sale with proposed distributions under there.   There was no Plan.

The Supreme Court said you can't authorize Plan-type distributions under a Sale Order.  It's got to be under a Plan.  It has to go through 1129 scrutiny.

But that's exactly what happened in this case. In this case, distributions were made and approved under a court-approved Chapter 11 Plan that was voted on by creditors, that there was a Disclosure Statement about. There was never a *Jevic* problem here to start from.

Moore's equitable subordination claim also fails. The Bankruptcy Code says that after notice and a hearing, the Court may, under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all a part of another allowed claim. That's Section 510B of the Bankruptcy Code.

Equitable subordination is remedial and is rarely

granted. *In re: Cajun Elec. Power Co-op, Inc.*, 119 F.3d 349, 357 (5th Cir. 1997). We don't have equitable consideration here and we don't have facts that even warrant their consideration. There are no bad facts. The Confirmation Order is final. Parties have allowed claims and are receiving distributions on account of their allowed claims.

But if what Moore and other first lien holders are really trying to assert are additional direct claims against first lien debt holders --  excuse me -- as first lien debt holders against other first lien debt holders based on the agreements embodied in the Sale Order and the Plan, well then, those claims were waived under the Settlement Agreement approved in connection with the Sale Order. Moore acquired Cetus's debt years after it settled and agreed to the releases under the Settlement Agreement and the Plan was confirmed. And a Creditor is entitled to no greater rights than Cetus.

Finally, because consideration for the Debtors' assets under the Sale Order were not valued at the multi-billion valuation Moore alleges, there are no viable claims for turnover or distribution of additional cash or property as a holder of a 1L debt claim.

As for all these reasons, the motion is denied. I'll get a short order getting incorporating the Court's

Findings of Facts and getting them on the Docket.

Thank you very much.  Have a good day.

We're adjourned.

(Hearing adjourned at 3:13 p.m.)

*  *  *  *  *

*I certify that the foregoing is a correct transcript to the best of my ability due to the condition of the electronic sound recording of the ZOOM proceedings in the above-entitled matter.*

*/S/ MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*

*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #69114*

*DATE FILED:  SEPTEMBER 17, 2024*